UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Major League Baseball Properties, Inc., <br><br> Plaintiff, <br><br> - against - <br><br> Salvino, Inc., <br><br> Defendant. | 00 Civ. 2855 (RCC) |

| | |
|---|---|
| Salvino, Inc., <br><br> Plaintiff, <br><br> - against - <br><br> Major League Baseball Enterprises, Inc. and <br> Major League Baseball Properties, Inc., <br><br> Defendants. | 00 Civ. 4153 (RCC) <br><br> OPINION & ORDER |

**RICHARD CONWAY CASEY, United States District Judge:**

  These disputes arise out of Salvino, Inc.'s ("Salvino") production and sales of small plush bean-filled bears, known as Bammers, featuring the logo of certain Major League Baseball ("MLB") Clubs. Major League Baseball Properties ("MLBP") is responsible for licensing the rights to use MLB intellectual property on retail products. On November 3, 1999, after learning Salvino was making and selling Bammers with MLB Club logos, MLBP sent it a cease-and-desist letter. In response, Salvino filed a complaint in November 1999 in the U.S. District Court for the Central District of California against MLBP and MLBP's corporate parent Major League Baseball Enterprises ("MLBE"). Salvino alleges that the organization of MLBP and its licensing activities violate antitrust laws. MLBP then brought its trade dress, breach of contract, and unfair competition action against Salvino in this Court. The California court subsequently transferred the Salvino action here. MLBP and MLBE now move for summary judgment on Salvino's antitrust, California unfair competition, and tortious interference claims. Salvino cross moves for partial summary judgment on MLBP's trade dress claims. For the reasons explained herein, the motion by MLBP and MLBE is granted, and Salvino's motion is denied.

## I. Background

Unless otherwise indicated, the following facts are not in dispute. Since 1987, with limited, and irrelevant, exceptions, MLBP has been the worldwide agent for licensing the use of intellectual property rights owned or controlled by MLB Clubs, the Baseball Office of the Commissioner ("BOC"), and MLBP on retail products. (MLBP 56.1 Stmt. ¶¶ 2, 18, 25.) A series of agreements known as the Agency Agreement govern MLBP's operations and relationships with the Clubs. (Id.) The Agency Agreement distinguishes between products sold at retail and those that Clubs give away as part of a promotion at a game. (MLBP 56.1 Stmt. ¶ 11.) Retail items – even if they are sold at a concession stand inside a MLB stadium – must be licensed through MLBP. (Id.) "Giveaways," however, do not require a license from MLBP as long as they do not include the marks of another Club, MLBP, or the BOC. (MLBP 56.1 ¶ 12.) Similarly, Clubs may sell products not licensed by MLBP at stadium concession stands provided the products do not use any marks owned by MLBP or the BOC. (MLBP 56.1 ¶ 13.)

Prior to MLBP's assumption of all licensing responsibility and authority, potential licensees had to approach each Club separately to obtain a license for MLB intellectual property. (MLBP 56.1 Stmt. ¶ 20.) For example, in 1965, the Houston Astros refused to permit Topps Chewing Gum to make or sell a baseball card with an Astros team photo. (MLBP 56.1 Stmt. ¶ 21.) Similarly, Coca-Cola did not include MLB Clubs in an "under the cap" promotion it ran in the 1960s because it was "too cumbersome" to obtain licensing rights from each Club individually. (MLBP 56.1 Stmt. ¶ 22.) MLBP contends that its current organization provides efficient protection, quality control, and design of MLB's intellectual property, as well as efficiencies in promotions, advertising, sales, administration, and licensing operations. (MLBP 56.1 Stmt. ¶ 19, 78-81). Salvino claims there are less restrictive ways to achieve efficient licensing operations. (Salvino Resp. to MLBP 56.1 Stmt. ¶ 37.)

Between 1989 and 2001, Salvino obtained licenses from MLBP to use MLB intellectual property on baseball figurines. (MLBP 56.1 ¶ 92.) Under the MLBP license agreement signed by Salvino, Salvino promised it would not "use the Logos in any manner other than as licensed . . . ." (MLBP 56.1 ¶ 95). In 1998, Salvino began selling plush bean-filled bears known as Bammers. (MLBP 56.1 ¶ 96.) MLBP contends that Salvino did not request a license to use MLBP intellectual property on the Bammers, but did obtain a license from the MLB Players Association to use MLB player names on them. (MLBP 56.1 ¶ 97.) Salvino claims it tried to obtain a license from MLBP to use MLB logos and other intellectual property on its Bammers. (Salvino Resp. to MLB 56.1 ¶ 98.) Salvino sold its Bammers to retailers, including MLB Clubs and stadium concession stands. (MLBP 56.1 ¶¶ 111-12.)

Colin Hagen of MLBP assumed responsibility for the Salvino account in late 1998. (MLBP 56.1 ¶ 121). He met with Wayne Salvino, Salvino's vice president, to discuss the possibility of a license for Club trademarks on Bammers in the spring of 1999. (MLBP 56.1 ¶¶ 94, 123-24.) MLBP claims it never received a license application from Salvino. (MLBP 56.1 ¶¶ 126-27.) Salvino claims that Wayne Salvino personally delivered a completed license application to Hagen, although it has not produced a copy of the completed form. (Salvino Resp. to MLB 56.1 ¶ 126; MLB 56.1 ¶ 128.) Regardless, MLBP did not issue Salvino a license to use

2

MLB intellectual property on Bammers.

In March 1999, MLBP granted a non-exclusive license to Team Beans to use certain MLB intellectual property on bean-filled bears. (MLBP 56.1 ¶ 130.) Team Beans also obtained an exclusive license for the use of Club marks on plush bears with sewn-on authentic uniforms and a non-exclusive license for other categories of bears, including bean-filled bears similar to Bammers. (MLBP 56.1 ¶ 131). MLBP claims Salvino tried to make its Bammers match Club uniforms as much as possible, including, for example, by using color matches provided in the MLBP Style Guide that Salvino received in conjunction with its previously obtained MLBP licences. (MLBP 56.1 ¶¶ 136, 139-40.) In 2000, Salvino placed the city or state name across the chest of certain of its Bammers. (MLBP 56.1 ¶ 141.) The parties dispute whether Salvino told Clubs and retailers that it had an MLBP license for its Bammers. (MLBP Resp. to Salvino 56.1 ¶ 8.)

In October 1999, MLBP learned that Salvino was making and selling Bammers with the Arizona Diamondbacks logo to the Diamondbacks Club store without a MLBP license. (MLBP 56.1 ¶ 145.) Salvino claims the Diamondbacks ordered these Bammers. (Salvino Resp. to MLBP 56.1 ¶ 145.) Regardless, MLBP sent a cease-and-desist letter to Salvino and Salvino responded by filing a lawsuit against MLBP in the Central District of California on November 23, 1999. (MLBP 56.1 ¶¶ 146-47.) This consolidated litigation followed.

## II. Discussion
### A. Summary Judgment Standard

Summary judgment is appropriate where the parties' submissions demonstrate "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In evaluating a summary judgment motion, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. Anderson, 477 U.S. at 255. The party seeking summary judgment bears the initial burden of showing that no genuine issue of fact exists. Celotex, 477 U.S. at 323. Once such a showing is made, the opposing party must present "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." Scott v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

### B. MLBP's Motion for Summary Judgment on Salvino's Antitrust Claims

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.[1] The Supreme Court has limited § 1 of the Sherman Act "to prohibit only

---

[1] Salvino has elected to not proceed with its Sherman Act § 2 claim. (Salvino Opp'n to MLBP Mot. for Summ. J. at n.1.) Similarly, Salvino does not dispute MLBP's contention that

unreasonable restraints of trade." Nat'l Collegiate Athletic Ass'n v. Bd. of Regents, 468 U.S. 85, 98 (1984); Metro. Intercollegiate Basketball Ass'n v. Nat'l Collegiate Athletic Ass'n, 337 F. Supp. 2d 563, 569 (S.D.N.Y. 2004). "Independent conduct falls outside the purview of this provision." Id. "To prove a § 1 violation, a plaintiff must demonstrate: (1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade" under a per se or rule or reason analysis. Geneva Pharms. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 506 (2d Cir. 2004); see also Metro. Intercollegiate Basketball Ass'n, 337 F. Supp. 2d. at 569.

The parties disagree over how the Court should analyze Salvino's Sherman Act claim. MLBP argues that a rule of reason analysis is required. Salvino contends that the per se rule should be applied, but that even a quick look would demonstrate that MLBP's organization places unreasonable restraints on competition. "[T]he categories of analysis of anticompetitive effect are less fixed than terms like 'per se,' 'quick look,' and 'rule of reason' tend to make them appear. . . . The essential inquiry remains the same – whether or not the challenged restraint enhances competition." Cal. Dental Ass'n v. Fed. Trade Comm'n, 526 U.S. 756, 779-80 (1999).

For conduct to be illegal per se, it must fall within "the narrow range of behavior that is considered so plainly anti-competitive and so lacking in redeeming pro-competitive value that it is 'presumed illegal without further examination.'" Geneva Pharms., 386 F.3d at 506 (quoting Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 8 (1979)); see also United States v. Topco Assocs., Inc., 405 U.S. 596, 607 (1972) ("While the Court has utilized the 'rule of reason' in evaluating the legality of most restraints alleged to be violative of the Sherman Act, it has also developed the doctrine that certain business relationships are per se violations of the Act without regard to a consideration of their reasonableness."). "Restraints such as price fixing, market divisions, tying arrangements, and group boycotts have all been found to be unreasonable in and of themselves." Metro. Intercollegiate Basketball Ass'n, 337 F. Supp. 2d. at 570 (citing N. Pac. Ry. Co. v. U.S., 356 U.S. 1, 5 (1958)); see also Topco Assocs., 405 U.S. at 608 (noting courts may classify certain business relationships as per se illegal "only after considerable experience" with them).

This Court cannot say that the organization of MLBP and its licensing authority is a per se violation of § 1 of the Sherman Act. The Supreme Court in Broadcast Music, 441 U.S. at 20, found that the plaintiff's blanket licensing arrangement was not per se unlawful because it was "not a 'naked [restraint] on trade with no purpose except stifling of competition,' but rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use." Similarly, this Court finds that MLBP's role in licensing MLB intellectual property is not a naked restraint on trade. Like the license agreement in Broadcast Music, it also facilitates the efficient protection and quality control of MLB intellectual property. Moreover, courts have declined to apply the per se rule to sports leagues where cooperation among

---

MLBE is entitled to summary judgment on all of Salvino's claims and that summary judgment for MLBP is appropriate on Salvino's Clayton Act claim.

4

competitors "can under some circumstances have legitimate purposes as well as anticompetitive effects." N. Am. Soccer League v. Nat'l Football League, 670 F.2d 1249, 1258-59 (2d Cir. 1982) (applying rule of reason analysis to NFL's cross-league ownership ban); see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 99 (1984) (declining to apply the per se rule to "an industry in which horizontal restraints on competition are essential if the product is to be available at all").

Under a rule of reason analysis, which is applied "where, the economic impact of certain practices is not immediately obvious," Fed. Trade Comm'n v. Ind. Fed'n of Dentists, 476 U.S. 447, 459 (1986), "conduct will be deemed illegal only if it unreasonably restrains competition," Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 342 (1990). The plaintiff bears the burden of demonstrating that the challenged behavior "had an actual adverse effect on competition as a whole in the relevant market." Capital Imaging Assocs. P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 543 (2d Cir. 1993). Evidence that the plaintiff has been harmed as an individual competitor will not suffice. Atlantic Richfield, 495 U.S. at 343-44. If the plaintiff meets its burden, the burden shifts to the defendant to offer evidence of the pro-competitive effects of its agreement. Capital Imaging, 996 F.2d at 543. The burden then shifts back to the plaintiff to prove that any legitimate competitive benefits offered by the defendant could have been achieved through less restrictive means. Id. "Ultimately, the factfinder must engage in a careful weighing of the competitive effects of the agreement–both pro and con–to determine if the effects of the challenged restraint tend to promote or destroy competition." Geneva Pharms., 386 F.3d at 507 (citing Capital Imaging, 996 F.2d at 543).

Under a quick look analysis, the "plaintiff is relieved of its initial burden of showing that the challenged restraints have an adverse effect on competition because the anticompetitive effects are obvious." Metro. Intercollegiate Basketball Ass'n, 337 F. Supp. 2d. at 569. Under an "abbreviated or 'quick-look' analysis . . . an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." Cal. Dental, 526 U.S. at 770. The "quick-look analysis carries the day when the great likelihood of anticompetitive effects can easily be ascertained." Id. It is not appropriate, however, where the anticompetitve effects of an agreement are not obvious or may "have a net procompetitive effect, or possibly no effect at all on competition." Id. at 771. MLBP's expert identifies several procompetitive justifications for MLBP's arrangement, including the benefits of one-stop shopping for MLB intellectual property (MLBP 56.1 Stmt. ¶¶ 46-8), and the efficiencies of enforcement, quality control, and coordinated promotion, design, sales, and marketing support (MLB 56.1 Stmt. ¶¶ 62-91). While Salvino's expert conclusorily disagrees with MLBP's expert's opinion (Guth Decl. ¶¶ 8-19), MLBP's proffer demonstrates that the quick look doctrine is inappropriate here since the casual observer could not summarily conclude that MLBP's arrangement has an anticompetitive effect on customers. Cf. Cal. Dental, 526 U.S. at 570. The Court finds, therefore, that the rule of reason is the appropriate review for Salvino's claim.

Accordingly, Salvino bears the initial burden "of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market." K.M.B.

5

Warehouse Distrib., Inc. v. Walker Mfg. Co., 61 F.3d 123, 127 (2d Cir. 1995) (affirming district court's grant of summary judgment after the plaintiff failed to show the defendants' actions had an anticompetitive effect). The mere fact that Salvino did not receive an MLBP license for its Bammers is not sufficient. Id. (explaining "the plaintiff must show more than just that he was harmed by defendants' conduct). Salvino has not offered any evidence of an adverse effect on competition resulting from MLBP's licensing authority. Indeed, Salvino did not respond to MLBP's arguments regarding the rule of reason analysis and instead urged the Court to analyze its claims under the per se rule or quick look doctrine, neither of which would require Salvino to make a showing of adverse effect on the market. Further, Salvino does not dispute MLBP's stated increase in MLBP-licensed products since MLBP took over licensing authority for MLB intellectual property. (MLBP 56.1 Stmt. ¶¶ 26-36.) Salvino only takes issue with MLBP's proffered reasons for the increase, i.e., it claims the increase is a product of the "licensing boom" and not a result of MLBP's centralized process. (Salvino Resp. to MLBP 56.1 Stmt. ¶ 29.)

"'Where the plaintiff is unable to demonstrate such actual effects . . . it must at least establish that defendants possess the requisite market power' and thus the capacity to inhibit competition market-wide." K.M.B. Warehouse Distrib., 61 F.3d at 129 (citing Capital Imaging, 996 F.2d at 546). Salvino argues that a showing of market power is unnecessary (Salvino Mem. in Opp'n to MLBP Mot. for Summ. J. at 8 n.3), and dismisses as immaterial MLBP's attempts to define the relevant market (Salvino Resp. to MLBP 56.1 Stmt. ¶¶ 60-61). Salvino cannot escape its burden of demonstrating MLBP's market power in light of its inability to demonstrate an actual adverse effect on competition. Capital Imaging, 996 F.2d at 546. The Court finds that Salvino has failed to offer any evidence of MLBP's actual adverse effect on the market or its sufficient market power. Accordingly, Salvino cannot demonstrate under the rule of reason that MLBP places unreasonable restraints on trade. MLBP's motion for summary judgment on Salvino's § 1 Sherman Act claim is granted.

The parties agree that Salvino's California unfair competition claim and New York tortious interference with a contract claim depend on the success of its Sherman Act claim. Since the Court grants summary judgment to MLBP on the Sherman Act claim and Salvino has not offered any evidence to support the California unfair competition or New York tortious interference claim, MLBP's motion for summary judgment on Salvino's state law claims is also granted.

**C. Salvino's Motion for Partial Summary Judgment on MLBP's Lanham Act Claim**

Salvino moves for partial summary judgment on MLBP's Lanham Act claims. Salvino produced Bammers with the names of MLB players after it received a license to do so from the MLB Players Association. (Salvino 56.1 Stmt. ¶ 4.) The Salvino Bammers featured the names and numbers of the players, as well as their Club colors and, in some instances, city names in block letters. (MLBP Resp. to Salvino 56.1 Stmt. ¶ 8.) Salvino does not dispute that its Bammers colors were chosen to be similar to Club colors and to depict the players' association with their respective teams. (Salvino Mem. in Supp. of Summ. J. at 6.) By using team colors on the Bammers, MLBP claims Salvino infringed and diluted its trade dress under §§ 43(a) and (c) of the Lanham Act. MLBP has since withdrawn with prejudice its dilution claim. (MLBP

Opp'n to Salvino Mot. for Summ. J. at 1.)

Section 43(a) of the Lanham Act protects trade dress. 15 U.S.C. § 1125(a). "A product's trade dress encompasses the overall design and appearance that make the product identifiable to consumers." Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 118 (2d Cir. 2001). A product's trade dress is protected if it is not functional and if it is either inherently distinctive or has acquired secondary meaning in the marketplace. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992). To prevail on a trade dress infringement claim, a plaintiff must also prove that the allegedly infringing product is likely to confuse customers as to its source or sponsorship. Nora Beverages, 269 F.3d at 118-19; see also Polaroid Corp. v. Polorad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961) (setting forth multi-factor test to determine the likelihood of confusion). In undertaking its analysis, the Court understands it "must not lose sight of the underlying purpose of the Lanham Act, which is protecting consumers and manufacturers from deceptive representations of affiliation and origin." Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 375 (2d Cir. 1997).

The Court begins with the question of functionality. "In an action for trade dress infringement brought under 15 U.S.C. § 1125(a), Congress has placed the burden on the plaintiff to show that its unregistered trade dress is non-functional." Deere & Co. v. MTD Holdings Inc., No. 00 Civ. 5936 (LMM), 2004 WL 324890, at *7 (S.D.N.Y. Feb. 19, 2004). A feature is functional if it is "essential to the use or purpose of the article or if it affects the cost or quality of the article, that is if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165 (1995) (citations omitted). MLBP argues, correctly, that the color of a Bammer is not essential to its purpose and does not affect its quality or cost. Salvino has used other colors and color combinations on its baseball player Bammers that are not meant to replicate the player's Club colors. (See, e.g., MLBP Ex. 138). The colors Salvino chooses to place on its Bammers do not represent an "advance in the useful arts, the [colors] merely function to enable consumers . . . to identify a [Bammer] with a particular [baseball player.]" Warner Brothers, Inc. v. Gay Toys, Inc., 724 F.2d 327, 332 (2d Cir. 1983) (concluding " that only functions which represent development of useful features, and not functions which serve merely to identify, are considered in determining functionality"). Accordingly, MLBP has sufficiently demonstrated the non-functional nature of the Bammers' trade dress.

Next, MLBP must demonstrate that the Clubs' trade dress are either inherently distinctive or have acquired a secondary meaning in the marketplace. Two Pesos, 505 U.S. at 769. "A trade dress based on the design of a product can never be inherently distinctive." Malaco Leaf, AB v. Promotion in Motion, 287 F. Supp. 2d 355, 363 (2d Cir. 2003) (citing Wal-Mart Stores, Inc. v. Samara Bros. Inc., 529 U.S. 205, 212-215 (2000)). Accordingly, MLBP must come forward with evidence that the Clubs' team colors and city names have achieved a secondary meaning. That is, "in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 115 (2d Cir. 2001). MLBP's success in this regard requires an inquiry into

the following factors: "(1) advertising expenditures, (2) consumer studies linking the [trade dress] to the source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the [trade dress], and (6) the length and exclusivity of the [trade dress'] use." Deere & Co., 2004 WL 324890, at *10. Salvino argues that MLBP has not presented evidence to demonstrate a secondary meaning for each of the Clubs' colors or combinations. However, summary judgment on this fact-sensitive inquiry is appropriate only if MLBP completely fails to "come forward with evidence that would demonstrate the need for a trial on this issue." Ideal World Mktg. Inc. v. Duracell, Inc., 15 F. Supp. 2d 239, 245 (E.D.N.Y. 1998).

MLBP argues that the Clubs' trade dress is extensively advertised; its consumer surveys indicated recognition of Clubs' colors and some confusion regarding the source of Bammers (MLBP Ex. 138); the Clubs' trade dress and city names receive substantial media attention; MLBP-licensed products exceeded $10 billion in sales since 1992 (MLBP Ex. 126, ¶ 5); and that most MLB Clubs have long histories and their colors, uniforms, and city names have long been used to identify them. Most pointedly, Salvino's own actions demonstrate that the trade dress is subject to intentional imitation. For example, Wayne Salvino, Salvino's president, testified that he selected colors for Bammers in light of the fact that "certain players are associated with certain colors." (MLBP Ex. 27 at 208.) He explained, "when people think of Griffey when he was with Seattle, they would probably think green . . . .") (Id.) Rick Salvino testified that "people . . . want the logos . . . . They want the whole piece of pie." (MLBP Ex. 135 at 203-04). Salvino does not address these arguments or the record evidence cited by MLBP. Accordingly, the evidence cited by MLBP is sufficient to establish the existence of genuine issues of fact to be tried with respect to the secondary meaning of the MLB Clubs' trade dress. MLBP will, of course, be required to prove at trial the secondary meaning for each of the trade dress items for which it seeks protection. See Yurman Design, Inc. v. Golden Treasure Imports, Inc., 275 F. Supp. 2d 506, 513 (S.D.N.Y. 2003).

The Court finds that a genuine issue of fact exists as to whether MLB Clubs' trade dress has achieved a secondary meaning in the marketplace. As such, summary judgment on MLBP's Lanham Act claim is inappropriate.

### III. Conclusion

For the reasons explained above, MLBE's and MLBP's motion for summary judgment on all of Salvino's claims is granted. Salvino's motion for partial summary judgment on MLBP's trade dress claim is denied. MLBP is to inform the Court within three weeks of the entry of this order as to how it wishes to proceed with its remaining claims.

**So Ordered:** New York, New York
November 16, 2005

*Richard Conway Casey*

**Richard Conway Casey, U.S.D.J.**